

THE UNITED STATES OF AMERICA, *ex rel.*,
Rick Finsterbusch and Brian Healey,

          Plaintiff,

v.

PHILIPS NORTH AMERICA LLC D/B/A
PHILIPS HEALTHCARE, a subsidiary of
KONINKLIJKE PHILIPS N.V.,

          Defendant.

CIVIL ACTION NO.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

*Filed under seal pursuant to 31 U.S.C. § 3729*

## I.    NATURE OF ACTION

1.    This action is brought by *qui tam* relators, Rick Finsterbusch and Brian Healey (collectively, "Relators"), on behalf of the United States of America ("United States" or the "Government"), to recover monies wrongfully paid as a result of false claims made or caused to be made to the Government by Philips North America LLC d/b/a Philips Healthcare, a subsidiary of Koninklijke Philips N.V. ("Defendant," "Philips," or the "Company").

2.    From as far back as 2012 through the present, with the exception of a month in 2018, Philips has submitted false claims for payment for a portable medical monitoring device called the IntelliVue MP2 Mobile Patient Monitor ("MP2"), which the Company manufactures and sells to the Government both directly and through third-party resellers for use in military and other government aircraft. The size and portability of the MP2 makes it especially well-suited for use as a patient monitoring device on planes and helicopters used by Government agencies,

1

including the United States Air Force ("Air Force"), the United States Navy ("Navy"), the United States Secret Service ("Secret Service"), and the United States Coast Guard ("Coast Guard"), among others. For example, the MP2 is widely used on "MEDEVAC" aircraft designed to remove injured military troops from combat zones, including several U.S. special forces units. In addition, on information and belief, the MP2 is also likely to be used on strategically important aircraft used to transport senior Government officials.

3.     Due to the use of MP2s on vital Government aircraft – a high risk, potentially life-threatening setting – the Government's contracts with Philips and all resellers of the MP2s (collectively, the "MP2 Contracts") require as a precursor to sale both that the product be manufactured pursuant to detailed specifications and that it be certified for "airworthiness" through a rigorous, Government-sanctioned examination, testing and approval process. Such air-worthiness certification ensures that the MP2 and all of its component parts: (1) will work in the air; (2) will not hinder the operation or navigation of the aircraft; and (3) will not allow for hostile detection of the aircraft or the MP2. Pursuant to that stringent airworthiness certification regime, any alteration or upgrade made to the component parts of the MP2 requires Philips to re-certify the product's airworthiness before selling it to the Government.

4.     In direct contravention of Government regulations, airworthiness specifications and the requirements set forth in the MP2 Contracts, Philips repeatedly substituted key components of MP2s sold to the Government without re-certifying the product for airworthiness. Most notably, Philips repeatedly replaced the main circuit board, or "motherboard," in the MP2's monitor with a different motherboard. Each time Philips replaced that motherboard on the MP2, Philips was required, yet failed, to submit it for airworthiness re-certification. Despite that indisputable fact – which Philips consistently concealed from the Government and its own distributors – the Company

2

continued to sell thousands of uncertified MP2s to the Government both directly and through distributors.

5.      Philips's failure to obtain airworthiness re-certification of the re-modeled MP2 was a highly material breach of the MP2 Contracts. The very purpose of the Government's strict airworthiness standards and testing protocols is to ensure that Government missions involving air travel and the lives of associated passengers are not unreasonably endangered by mechanical devices used on such aircraft. Philips's knowing failure to re-certify the MP2 for airworthiness after re-modeling the product continues to place sensitive Government functions and aircraft passengers – including high-ranking Government officials, first responders, and military members – at significant risk of harm.

6.      Accordingly, Defendant's conduct violates the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended ("FCA"), which provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty between $11,181.00 - $22,363.00 for each violation, plus three times the amount of damages sustained by the Government for the act of that person, 28 C.F.R. § 85.5.

7.      This action thus seeks to recover damages and civil penalties on behalf of the Government arising from FCA violations by Defendant and/or its partners, agents, employees, representatives, and co-conspirators in violation of the FCA. Applicable treble damages due to the Government are at least $2,124,000, but Relators estimate that, when sales by Philips and its other distributors are considered, damages potentially could exceed $90 million. Applicable penalties due to the Government are at least $1,733,055, but likewise could be much greater based on Relators' estimates of Philips's direct and indirect sales.

## II.    JURISDICTION AND VENUE

8.    Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular the FCA, 31 U.S.C. § 3729, *et seq.*

9.    This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), because Defendant maintains and operates a place of business in this District. Moreover, the FCA authorizes nationwide service of process and Defendant has sufficient minimum contacts with the United States.

10.    Venue is proper in the United States District Court for the District of Massachusetts pursuant to 31 U.S.C. § 3732(a), because Defendant is headquartered in this District.

11.    Relators are unaware of any public disclosure of the information or allegations that form the basis of this Complaint.  To the extent that any such disclosures exist, Relators are the original source of such disclosures.

## III.    PARTIES

12.    Relator 1, Rick Finsterbusch ("Finsterbusch"), is an individual residing in Pickerington, Ohio. Relator 1 brings this action for violations of the FCA on behalf of himself and the Government pursuant to Section 3730 of the FCA.

13.    Relator 2, Brian Healey ("Healey"), is an individual residing in North Andover, Massachusetts. Relator 2 brings this action for violations of the FCA on behalf of himself and the Government pursuant to Section 3730 of the FCA.

14.    Relators are the "original source" of the allegations made herein, as that term is defined in the FCA, 31 U.S.C. § 3730(e)(4)(B).  Relators have independent, material, and first-hand knowledge of the information on which the allegations of fraudulent misconduct are based.

Additional allegations are based on the related investigation of Relators' counsel and on information and belief.

15.     As required under the FCA, 31 U.S.C. § 3730(b)(2), contemporaneously with the filing of this Complaint, Relators will provide to the United States Attorney for the District of Massachusetts and the United States Attorney General a written disclosure of substantially all material evidence and information related to this Complaint.

16.     The United States is named as a plaintiff because funds of the United States were (and are) awarded and paid to Defendant in connection with its fraudulent conduct in causing the Government to pay for non-conforming and sub-standard MP2s that have not been certified for airworthiness as required by the MP2 Contracts.

17.     Defendant, Philips North America LLC d/b/a Philips Healthcare, a subsidiary of Koninklijke Philips N.V., is a corporation organized under the laws of Delaware, registered to conduct business in Massachusetts and with a principal place of business in Andover, Massachusetts.

18.     Philips is currently subject to a Consent Decree for Permanent Injunction entered in the United States District Court for the District of Massachusetts on October 31, 2017 ("Philips Consent Decree"). The Philips Consent Decree concerns the Company's alleged violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* ("FDA Act"), related to certain allegedly adulterated products "in that the methods uses in, or the facilities or controls used for, their manufacture, packing, storage and installation are not in conformity with current good manufacturing practice ("CGMP") requirements set forth in 21 C.F.R. Part 820." In resolution of those alleged violations, Philips agreed not to produce any such products until such time as the

Company recalls defective products, pays related costs and meets various quality control and compliance benchmarks set forth in the Philips Consent Decree.

## IV.   RELEVANT GOVERNMENT AGENCIES

19.   The Defense Logistics Agency ("DLA") is the Government's combat logistics support agency, which manages the global supply chain – from raw materials to end user to disposition – for the Navy, Air Force, United States Army ("Army"), United States Marine Corps ("Marines"), among others. As described herein, the DLA purchased MP2s from Philips and its resellers over the course of approximately a decade.

20.   The Department of Veterans Affairs ("VA") operates a nationwide system of hospitals, clinics, Veterans Integrated Service Networks ("VISN"), data processing centers, and National Cemeteries that require a broad spectrum of goods and services. As described herein, the VA purchased MP2s from Philips and its resellers over the course of approximately a decade.

21.   The Department of Homeland Security ("DHS") has a mission that includes preventing terrorism, enhancing security and ensuring disaster resilience, and includes the United States Secret Service and the United States Coast Guard within its sphere of authority. As described herein, DHS purchased MP2s from Philips and its resellers over the course of approximately a decade.

22.   The General Services Administration ("GSA") provides centralized procurement for the federal government, providing billions of dollars of products, services, and facilities that federal agencies need to serve the public. As described herein, Philips contracted through the GSA to supply the MP2 to various government agencies including without limitation the VA and the United States Department of Defense ("DoD").

# V.    SUBSTANTIVE ALLEGATIONS

## A. The MP2

23.    The MP2 is a mobile medical monitoring device that Philips manufactures and sells to the public. Owing to its small size and portability, the MP2 is useful for patient monitoring on planes, helicopters and other fixed-wing and rotary-wing aircraft. Philips currently markets the MP2 for use in a "road ambulance, airplane, or helicopter." The MP2 retails, depending upon specification and bundle options, for between $3,500 and $9,000 per bundle.

24.    The MP2 is in high demand for both public and private use. In addition to use by commercial air ambulance companies, it is used by United States military units and other federal agencies. On information and belief, the MP2 is also used on strategically important Government aircraft.

25.    Pursuant to various Government provisions alleged herein, all medical equipment used on Government aircraft must be certified for "airworthiness." In January 2012, Philips obtained airworthiness certification for the MP2. Specifically, USAARL produced Report No. 2012-06, entitled "Rotary-Wing Airworthiness Certification Evaluation of the Philips Medical Systems IntelliVue X2 and MP2 Patient Monitors" ("2012 Airworthiness Certification"). The 2012 Airworthiness Certification sets forth a battery of tests successfully performed upon the MP2 by military technicians to ensure that the product met strict airworthiness criteria for use on military aircraft. The 2012 Airworthiness Certification made clear, however, that any change or upgrade to the equipment would require re-testing for the MP2 to retain its airworthiness certifications.

B. **The MP2 Contracts**

26.     On or about August 1, 2012, Philips entered into a contract under GSA Master Supply Schedule FSS-65-11-A and Federal Supply Schedule V797P-2238D with the Government for the sale of "Medical Equipment and Supplies" ("Philips Government Contract"). Pursuant to the Philips Government Contract, Philips lists numerous medical products, including the MP2, for sale to government agencies through the GSA and VA, among other agencies.

27.     In addition to selling various products to the Government, including the MP2, Philips entered into distribution agreements with various entities to resell Philips's products, including the MP2, to the Government. Relators are partners in one such entity called Janz Corporation ("Janz").

28.     Janz, a for-profit corporation founded in 1999, is a Service-Disabled Veteran-Owned Small Business ("SDVOSB"), which allows it to obtain certain Government contracts that are set aside for SDVOSB vendors. Janz provides medical equipment and services to several federal government agencies, including the DoD, DHS and the VA.

29.     Finsterbusch is Janz's current Chief Executive Officer ("CEO") and Healey is its current President. Finsterbusch and Healey both previously worked in Government sales at Philips and thus possess familiarity with the Company's processes and procedures related to Government contracting.

30.     From October 2004 – December 2013, Finsterbusch served as Philips's Account Manager for Government Sales and, subsequently, Government Sales Manager. As Account Manager for Government Sales, Finsterbusch was responsible for selling cardiac resuscitation devices to the Government, including automated external defibrillators, cardiac monitors and

manual defibrillators. As Government Sales Manager, Finsterbusch managed a three-person team that, along with distribution partners, sold Philips products to the Government.

31.     From 2009 – 2011, Healey served as Philips's Director of Marketing, with responsibility for marketing the pre-hospital Government market. In that capacity, Healey managed the airworthy testing program for several Philips products, including the FR3 AED, the MP2 and the MRx Monitor Defibrillator. As Philips's Vice President of Business Development (Government) from 2011 – 2013, Healey developed new products for the Government market, including ultrasound, digital pathology, EVAC technologies and remote ECare.

32.     On or around May 9, 2014, Janz entered into a Philips Healthcare Federal Reseller Agreement ("Distribution Agreement") with Philips. Pursuant to the Distribution Agreement, Janz served as a distributor of products, accessories and product packages, including the MP2, for which Philips was the Original Equipment Manufacturer ("OEM"). For Government contracting purposes, Philips, as OEM, was responsible for the technical data, manufacturing, inspection and certifications that are required for any such products that Janz sold to the Government. Pursuant to Paragraph 4.C of the Distribution Agreement, Janz has no authority to enlarge and/or modify any Philips product warranty. Nor can Janz, pursuant to Paragraph 4.C of the Distribution Agreement, make any warranty or commitment on behalf of Philips. The Distribution Agreement was renewable annually – and was, in fact, renewed annually – for each year through and including 2018.

33.     In addition to entering into the Distribution Agreement, Janz, like all Philips distributors that intended to resell the Company's products to the Government, also entered into a separate reseller contract with the Government. On August 4, 2015, Janz was awarded DLA Contract SPE2D1-15-D-0008, allowing Janz to sell Philips products to the Government for a

period of five years ("Janz Government Contract"). Item 27b. of the Janz Government Contract incorporates 48 C.F.R. 52.212-4, which, in turn, provides that "[Janz] shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract."

34.     The Janz Government Contract is valid through August 2020. Under the Janz Government Contract, the military is permitted to order approved products specified in the included "Schedule of Supplies" by submitting a purchase order, which Janz would then fulfill without the need to enter into a separate agreement for each sale. The MP2 and all related accessories are set forth the Schedule of Supplies included in the Janz Government Contract, a summary of which items are as follows:[1]

| Part Number | U o S | Items per U o S | Unit Price | Delivery | Product Name |
|---|---|---|---|---|---|
| M8102A_B23 | EA | 1 | 5,306.66 | 15 | M8102A B23 ECG, Resp, NBP, SpO2, CO2 |
| M8102A_B22 | EA | 1 | 4,237.55 | 15 | M8102A B22 ECG, Resp, NBP, SpO2, P+T |
| M8102A_B20 | EA | 1 | 3,817.05 | 15 | M8102A B20 ECG, Resp, NBP, SpO2 |

35.     On information and belief, Philips has executed separate distribution agreements with at least five distributors other than Janz, all of which would have entered into separate reseller agreements with the Government allowing them to resell various Philips healthcare products, including the MP2 and related accessories.

---

[1]     The Government Contract also lists numerous optional parts often required by customers for use with the MP2, each of which Janz and other distributors usually sell in a "bundle" with the MP2 upon customer request. Relators allege that amounts paid for uncertified MP2s purchased with such parts are recoverable in their entirety by the Government because such items are accessories that would not have been purchased without the false certification of the MP2's airworthiness.

## C. "Airworthiness" Certification of "Aeromedical" Devices

36. The design of most medical devices contemplates their use in settings with strict environmental controls, such as stationary hospitals. Such devices, however, are often the best equipment available to care for patients during air transport from one location to another. Indeed, in some circumstances, in-flight treatment facilitated by certain carry-on medical ("aeromedical") devices can be life-sustaining.

37. Given that such aeromedical equipment is largely designed for use in a controlled environment, it is not always clear whether a particular device will function properly in the volatile and dynamic environment of an aircraft. It is equally unclear whether the device itself will interfere either with the safe operation of the aircraft and/or with the successful execution of any related aeronautical mission. For example, the operation of an aeromedical device may interfere with an aircraft's communications, electromagnetic or other instrumentation systems, or vice versa, which could expose both the patient and other flight passengers to hazardous situations. Similarly, in-flight operation of an aeromedical device could allow a hostile party to detect and/or track the aircraft, the unit and/or the patient, similarly compromising patient or operational safety.

38. Given the myriad uses the Government has for aeromedical equipment, most notably military operations, the joint services of the DoD have developed testing methods that aeromedical devices must undergo in order to obtain various "airworthiness" certifications necessary for a particular device to be used aboard a military aircraft. Such certifications consist of the following non-exhaustive list of certifications: (1) the Army's fleet Airworthiness Release ("AWR") and Aeromedical Certification Memorandum ("ACM"); (2) the Air Force's Safe-to-Fly ("STF") certification; and (3) the Navy's Navy Flight Clearance through Class Desks Managers at Naval Air Systems Command ("NAVAIR").

39.     In an effort to provide a complete description of the various testing procedures that equipment must undergo to obtain airworthiness certification, the U.S. Army Aeromedical Research Laboratory ("AARL") and the U.S. Air Force (Aeromedical Branch) Aeromedical Test Laboratory ("AFATL") collaborated to develop a report entitled the Joint Enroute Care Equipment Test Standard ("JECETS"), which sets forth the requirements that all aeromedical equipment must meet to obtain various airworthiness certifications, including the AWR, the ACM, the STF and the NAVAIR.

40.     With respect to airworthiness certification of aeromedical equipment, the JECETS sets forth the following:

> MIL-HDBK-516 establishes the airworthiness certification criteria to be used as guidance for defining certification requirements. All components, including aeromedical equipment, either individually or as part of a subsystem, must be verified to pass all safety-related qualification tests.

MIL-HDBK-516 is a 522-page document entitled the "Department of Defense Handbook: Airworthiness Certification Criteria," which sets forth specific criteria that all onboard systems and equipment must meet to obtain airworthiness certification.

41.     According to JECETS, in addition to the criteria set forth in MIL-HDBK-516, aeromedical devices, including the MP2, are required to undergo additional testing to ensure compliance with MIL-STD-461, which tests equipment for electromagnetic compatibility, and with MIL-STD-810G, which emphasizes tailoring the environmental design and test limits of equipment to correspond to the conditions that it will experience through its service life.

42.     Given the high-risk, possibly life-threatening, situations in which the Government uses aeromedical equipment, certification for product airworthiness is a paramount consideration. Airworthiness certification confirms that a particular device will work in the air, will not hinder the operation or navigation of the aircraft and will not allow for hostile detection of the aircraft or

the unit/patient. Further evidencing the importance of airworthiness certifications, passenger loads on Government aircraft include some of the military's most specialized forces and/or the most senior Government officials – including both the President and Vice President of the United States. Accordingly, all aeromedical equipment purchased by the Government, by law, must receive the appropriate airworthiness certifications as set forth in JECETS and MIL-HDBK-516. Moreover, pursuant to those same regulations, to the extent that any aspect or component of an aeromedical device is altered or upgraded in any way, all such airworthiness certifications must be re-obtained before the newly redesigned product can be sold to the Government.

**D. Sales of Uncertified MP2s to the Government**

43. At various times since 2012, Philips made false claims to the Government with respect to the sale of hundreds of MP2s that lacked required airworthiness certifications. In addition, Philips caused various resellers of the MP2 to make similar false claims related to the resale of uncertified MP2s to the Government pursuant to their respective reseller agreements with the Government. On information and belief, such false claims related to the sale of uncertified MP2s continues to this day, both by Philips and by its distributors, as caused by Philips.

**1. Sales of Uncertified MP2s from Sometime After January 2012 to November 2015**

44. In or around late 2014, Philips notified its distributors that, in an effort to accommodate requests made by stationary hospital customers of the MP2, the Company would be replacing the motherboard in the MP2 with a new motherboard. Philips did not disclose the exact date on which the MP2 would no longer be produced with the original motherboard. Pursuant to the MP2 Contracts, including the Janz Government Contract, replacing the MP2's motherboard invalidated the product's airworthiness certifications. Accordingly, distributors such as Janz,

which sold the MP2 to Government customers, asked Philips how it planned to address the post-remodeled MP2's lack of airworthiness certification.

45.     Philips initially told concerned distributors that the Company would fill Government MP2 orders with product "bundles" that were produced with the original motherboard that was certified for airworthiness. For example, Philips's Senior Global Product Manager, Enzo T.E. Park ("Park"), emailed Janz on November 12, 2014, stating that "I checked with production and learned that we can produce maximum 30 of MP2 bundles *with the remaining old boards in stock.*" (emphasis added).

46.     Given the popularity of the MP2 with Government customers, however, there was a concern that Philips's distributors would no longer be able to sell the MP2 to Government customers when Philips ran out of stock of the airworthy motherboards to include in Government "bundles." Consequently, efforts were made to have Philips re-certify the re-modeled MP2 for airworthiness. Janz, for example, emailed Philips's Senior Marketing Manager, Eric Schaffer ("Schaffer"), on December 24, 2014, and again on December 30, 2014, seeking information on whether Philips had plans to re-certify the re-modeled MP2 for airworthiness when the Company's stock of airworthiness-certified motherboards was depleted.

47.     In response, Philips assured distributors and their customers that the Company was working to resolve the MP2's airworthiness issue to ensure that distributors had sufficient stock of airworthy MP2s to sell to Government customers. For example, in an email dated December 31, 2014, Philips's Senior Manager, Bill Hurtado ("Hurtado"), told Janz's customer, Air Force Major Arthur Knight, that despite "misinformation" about the MP2, "let me assure you the MP2 is available and ready for delivery for any of the military needs." To remove all doubt as to Hurtado's precise point, he further stated "[t]he MP2 has been rated Safe (sic) to fly and has an

Airworthy rating for fixed and rotary wing aircraft used by the US Army and US Air Force medical commands."

48.     Philips's representatives also communicated with distributors concerning the MP2 airworthiness issue, reassuring them that the Company would resolve the issue in a manner that did not threaten future Government orders of the MP2. For example, on or around January 6, 2015, Park emailed Janz the following as reassurance that airworthy MP2 inventory would be available to meet future sales:

> Bob Eschelman, the test engineer at USAARL has been in contact with us for the board changes and supplied with many different forms of documents including the side by side comparisons.
>
> Recently Eric [Schaffer] contacted Bob and other engineers with the latest JECETS summary file from BBN R&D manager. The Deputy Division Chief of ECAD US Army Aeromedical Research Laboratory at Ft Rucker replied that they will revisit the requirements and get back to us with required tests and other details.
>
> ***Understanding the urgency for the pending orders, we will do our best to find out test requirements and other arrangements to complete the tests at earliest possible date.***

(emphasis added).

49.     On February 6, 2015, Philips told at least one distributor that the remodeled MP2 was no longer certified as airworthy under the MP2 Contracts. Specifically, Schaeffer acknowledged to Healey and Finsterbusch via email that the MP2 needed to be re-certified for airworthiness due to the replaced motherboard. Shaeffer further confirmed, however, that Philips was only interested in re-testing the MP2 for airworthiness if the sales of MP2s to the Government justified the cost of re-testing, stating that:

> I wanted to reach out to you on the MP2 re-testing. We have been working with the team at USAARL to get the project moving forward and we just got the SOW from them. Form (sic) what I understand (keep in mind that was not involved in the first round of testing) the new SOW is considerably higher than what we paid

in the past. I assume it is because the government paid for most of the testing last time and Philips was on the hook for only a small part of it.

That said, we are pitching the project up the chain and we want to make sure we properly represent to opportunity for future IntelliVue MP2 sales into this market. *Looking back at 2014 it looks like we had about $450K in MP2 sales which would not be enough to justify the expense of re-testing.* I know your team has the $3.5 million blanket order on the table (not sure what that would be in annual sales though) and I was wondering what other opportunities were out there. Essentially, I am looking for an annual forecast of MP2 sales so we can get support for the re-testing expense.

(emphasis added).

50.    In a subsequent email dated February 12, 2015, Finsterbusch conveyed to Schaeffer his concern that Philips's failure to have the MP2 certified for airworthiness could put Janz and other distributors in an awkward situation with the Government, noting, for example, that an Air Force customer "is asking if the MP2 is safe to fly." Schaeffer's response was to confirm that the "MP2 shipping today utilizes the new board so *it does not have AWR [Airworthiness/readiness] or STF [Safe to Fly].*" (emphasis added). Schaeffer noted, however, that he was "trying to put together a business case to justify the cost of the retesting."

51.    Distributors such as Janz subsequently requested instructions from Philips on how to explain the MP2's lack of airworthiness certification to Government customers who wanted to use the product in an aircraft. For example, Finsterbusch emailed Schaeffer later in the day on February 12, 2015, asking "[n]ow that new MP2's are not AWR/STF are you going to send us a letter on this so we can explain this to customers wanting to purchase an MP2 for use on aircraft." Likewise, on March 6, 2015, Healey emailed Park, saying "[c]an you provide me with an update on the MP2's. We have some requests in house and we are not sure what to tell the DoD."

52.    In the months following the February/March 2015 correspondence between representatives of Philips and Janz, Finsterbusch and Healey had communications with members of Philips's senior management seeking clarification regarding the MP2's potential lack of

airworthiness, which prohibited lawful sales of the product under the MP2 Contracts. Despite those communications, Philips made no efforts from February-July 2015 to re-certify the remodeled MP2 for airworthiness. Instead, representatives of Philips told distributors that the Company would continue to prepare a special "military bundle" with the old motherboard to be sold to Government customers whose requirements included airworthiness certifications. Relators reasonably relied on those representations in continuing to market and sell MP2s to customers seeking models that were certified as air-worthy.

53. By June 2015, Philips's distributors were still unaware of the Company's plans for resolving the MP2's potential lack of airworthiness certification. For example, on or around June 29, 2015, Healey told Philips's Senior Manager ECR – Military, Andrea Gibson ("Gibson"), that a Janz customer – the United States Army's 18th Airborne Corps at Fort Bragg, North Carolina – requested forty-two MP2s that needed to be certified as airworthy ("18th Airborne MP2 Order"). Gibson told Healey in an email dated June 29, 2015, that Philips would fill the 18th Airborne Order with airworthy MP2s if Janz was willing to take inventory of another ninety airworthy MP2s. Janz was unclear on why it needed to buy additional airworthy MP2s, but nonetheless agreed to purchase the additional inventory under the assumption that Philips's stock of airworthy MP2s had been depleted and the Company needed to order a sufficient volume of old motherboards to justify related production costs.

54. On July 7, 2015, Hurtado confirmed to Janz that Philips was having difficulty producing airworthy MP2s, stating that:

> We have been working the BU to make sure we have the necessary number to manufacture the 'Old' type of MP2. In essence we are building these with the technology that has already been approved with AWR and STF. The problem is timing. It takes time for the manufacturer to tool up for that production.

17

The net/net is that we are working thru (sic) it. So I would NOT turn away any order because of this issue.

55.     In a response email that same day, Finsterbusch conveyed to Hurtado and Philips's Vice President for Sales, Paul Stoddard ("Stoddard"), the confusion that existed at the time among distributors and military customers alike concerning the airworthiness of the MP2, stating that:

> [t]he issue is not the delivery time to manufacture the board to consider a unit AWR. The is delivery time is acceptable and that is what we are communicating to anyone interested in purchasing an MP2. No orders are being 'turned away.' The issue is that the M8102A (configurable) is available for purchase to the military through anyone who offers MP2 to the military. If the military request M8102A they are under the assumption that it is AWR because of the fact that it has gone through MEDLOG and is part of their Allowance Standard . . . . If a unit orders an M8102A configurable through someone not familiar with the AWR/STF, then after being notified, if they choose to accept the non air worthy MP2, it could be there (sic) call. Not providing that piece of information is no insignificant matter. If Philips does not provide that information to the people who sell the product, how do you expect them to deal with this?

Finsterbusch further stated that, as a Philips distributor: "[w]e will do our part to ask the question when someone request (sic) an MP2 but we should not be taking the lead on this."

56.     On July 8, 2015, Gibson called Janz to confirm that, at that time, Philips would be selling airworthy MP2s, including the 18th Airborne Order, in a "bundle" that would be available in October 2015. Gibson did not resolve the issue raised by Finsterbusch in his July 7, 2015, email to Hurtado and Stoddard regarding the need for Philips to take the lead on clarifying generally to distributors and customers which MP2 product, going forward, would be certified as airworthy.

57.     Consequently, Healey sent an email that same day to numerous members of Philips's management – including Stoddard, Hurtado and Gibson – with a subject line of "MP2 Airworthy Status Update and Requested Clarification Document." In that email, Healey stated that:

> As you are aware, The Janz Corporation represents Philips products as an authorized Federal Reseller to the US Government. We request (in writing) a

18

clarification of the future status of the MP2 monitor (M8102A) as a certified airworthy device. Our customers require the MP2 to be airworthy and we need to inform them that the units we represent and stock meet the Mil Std 810G avionics requirements. . . . Please supply a letter of explanation as soon as possible so we can provide options and delivery expectations to our military customers.

58.     Finsterbusch likewise sent an email to Stoddard on July 9, 2015, expressly noting that "there is a sense of urgency" regarding the need to clarify to distributors and customers whether the MP2s offered for sale to the military had valid airworthiness certifications.  In that email, Finsterbusch further stated that "[Janz is] under a moral obligation to let [military customers] know that the MP2 is not AWR [airworthy] with its current platform, however [...] the messaging needs to come from Philips."

59.     In that email, Finsterbusch provided examples of the confusion that existed at the time among Philips's distributors and customers about the MP2's airworthiness.  In particular, Finsterbusch noted that "[w]hen the Rescue Wing had the [MP2] spec'd out for the RFQ by someone, there were not informed of the lack of AWR on the configurable MP2. *Neither was the White House when they purchased theirs*." (emphasis added).

60.     On July 14, 2015, having received no response from his email dated July 8, 2015, Healey sent a follow-up email to members of Philips's management, including Stoddard, Hurtado and Gibson, with the subject line "MP2 Airworthy Update-2nd Request." In that email, Healey demanded a "timely" response from Philips regarding his July 8th email regarding MP2 airworthiness due to pending and prospective MP2 orders that Janz had taken or anticipated taking in the future from Government customers that needed airworthiness assurances.

61.     On or about August 17, 2015, the Air Force's Life Cycle Management Center at Robins Air Force Base, Houston County, Georgia, issued a memo purportedly re-certifying the MP2 for airworthiness ("August 2015 MP2 Airworthiness Certification").  On information and

belief, however, the August 2015 MP2 Airworthiness Certification applied to the MP2 with the same component parts as that tested in connection with the 2012 Airworthiness Certification and *not the remodeled MP2*. Therefore, far from resolving the MP2 airworthiness concerns the Philips's distributors and Government customers had raised to Philips from February-July 2015, the August 2015 MP2 Airworthiness Certification added to their confusion about whether Government customers would receive an airworthy version of the MP2.

62.     Indeed, even after August 17, 2015, confusion still reigned among Philips distributors and customers about the MP2's airworthiness. For example, on September 18, 2015, Janz sold four MP2s to a United States Coast Guard unit in Atlantic City, New Jersey ("Coast Guard MP2 Order"). Yet when Philips employee, Joseph Brabec ("Brabec"), was on site configuring the MP2s in the Coast Guard MP2 Order on or around November 14, 2015, he confirmed that the MP2s Philips provided to the Government were the remodeled MP2s that did not contain the original motherboard that previously had been certified as airworthy. Moreover, Brabec told Janz the following via email dated November 14, 2015:

> I did not realize that the new Military version of the MP2 is shipping. The M8102AM looks the same as the MP2 but has a more robust Mother board. Their MP2s are the new M8102AMs not the M8102A. I suspect that the 42 monitors [for the 18th Airborne MP2 Order] at your warehouse and the monitors at USCG Miami are M8102AMs as well? It would have been nice to know.

63.     Responding to the continued confusion about the MP2's airworthiness certification, Janz made an ultimatum to Philips in an email to Hurtado on November 20, 2015, which stated:

> We can't stock 90 MP2's without any purchase orders. We are confident that we will get orders, but the risk is too high on stock this size of an order on speculation. MP2's (sic) are typically configured . . .so we also take the risk of stocking units that are not configured to our customers' needs?
>
> This is what we propose: We will provide a purchase order for 90 units (same price as last order for 42 units) with three provisions, 1) we have until June 1, 2016, to

pay for them 2) we have the option to return all or a portion of the units on June 1 with no penalty and 3) that the units contain the board that meets US Army Airworthy Release and Air Force Safe-to-Fly requirements

We will need this in writing.

64.     Hurtado responded to that email the very same day, making clear to Healey that Philips was unconcerned about the position in which the Company was placing its distributors in connection with the MP2's potential lack of airworthiness certification:

Points 1 and 2 are doable per the ordering process.  Nothing is invoiced until shipped

Point 3 will take some time.

*I really don't care if you order them or not so please know that.  What I'm suggesting is don't get caught short not having enough of these units to fulfill order when they do happen.  Mind you no other reseller will know about the airworthy ones.*  The only risk is Andrea getting orders thru (sic) ECAT or other GSAordrs (sic).  That is your competitor for these units.  Bird in the hand stuff! Lock them up.  You can always change the.order (sic).

(emphasis added).

65.     An interoffice memo prepared by Philips confirmed that, as discovered by Brabec, Philips was filling Government orders with products that had not been certified as airworthy.  On or around November 5, 2015, Philips issued an "Inter Office Service Memo" with a reference number IOSM86200062A ("Philips Military MP2 Memo").  The Military MP2 Memo stated that:

This ISOM *announces a new 6N Number 867059/M8102AM for the IntelliVue MP2 Military version.*  The new 6N number is necessary to distinguish between *the currently shipping MP2* and the MP2 Military version which is based on a HW revision that includes the previous main board and power board revision (Military tested version).

(emphasis added).  Accordingly, the Philips Military MP2 Memo confirms that, from the time Philips altered the motherboard in the MP2 that obtained the 2012 Airworthiness Certification until November 5, 2015, the Company shipped only the remodeled, uncertified MP2 both to

Government customers and to distributors who unwittingly sold resold them to Government customers.

66.     Annexed hereto and incorporated herein by reference as Appendix A is an Excel spreadsheet containing a list of selected purchase orders Janz filled for the MP2 ("Purchase Order Summary"), which is based on documents that Janz maintained in the ordinary course of business reflecting dates of purchase, purchase order numbers, serial numbers and Government end users for MP2s, including the 18th Airborne MP2 Order and the Coast Guard MP2 Order.[2]

67.     Annexed hereto and incorporated herein by reference as Appendix B are purchase orders/invoices reflecting approximately forty (40) MP2s that Janz sold to the Government prior to November 14, 2015, some or all of which were not properly certified as airworthy, including the 18th Airborne MP2 Order and the Coast Guard MP2 Order.[3]

68.     On information and belief, Philips and its distributors other than Janz also sold remodeled MP2s to the Government prior to November 14, 2015, that did not have proper airworthiness certifications. Relators estimate that, prior to November 14, 2015, the Government unknowingly purchased approximately 1,000 to 1,500 MP2s from Philips and/or a distributor other than Janz. In all, Relators estimate that Philips made, or caused to be made, approximately 1,040 to 1,540 false claims for payment of uncertified MP2s prior to November 14, 2015.

## 2.  Sales of Uncertified MP2s from November 5, 2015, through the Present

69.     Simultaneous with the issuance of the Philips Military MP2 Memo, the Company issued a Technical Data Sheet ("TDS") for the military version of the MP2, identified as "M8102AM" or "MP2M" ("Military MP2 TDS"), which indicated in multiple places that the unit

---

[2]     Pursuant to the Janz Government Contract, most product sales were conducted electronically, and thus the "claim for payment" to the Government was simply an electronic screen completed by the end user.
[3]     On some purchases orders/invoices, Janz referred to the MP2 as "MB3" or "MB1."

was certified for airworthiness. In particular, the Military MP2 TDS stated that the M82012AM was "U.S. Army airworthiness certified" and that "[t]he MP2M fulfills the requirements for use in an aircraft, helicopter, or military/civilian ambulance." The Military MP2 TDS was included in promotional materials provided to the Government for the MP2 and, upon information and belief, at all relevant times, was available on Philips's website.

70. Despite learning of the newly modified M8102AM version of the MP2, as described in the Philips Military MP2 memo and the Military MP2 TDS, Philips's distributors and customers remained skeptical of the airworthiness of the MP2. Accordingly, on information and belief, Philips's distributors, including Janz, periodically called and emailed Philips's senior management attempting to prevail upon the Company to re-certify the MP2 for airworthiness due to Government customer concerns about the airworthiness of the purported military version of the MP2.

71. On August 4, 2017, Janz finally impressed upon Philips that the Company needed to act immediately. Specifically, Healey informed Philips manager Derek Farias that "[t]here is a huge firestorm brewing over MP2 and the airworthy situation." Healey specifically noted in that email that the Navy had expressed significant concerns about the potential lack of airworthiness of the newly remodeled MP2 because it had already been accepted into Naval inventory prior to Navy officials having learned of the MP2's possible airworthiness issues. Healey closed his email by stating simply: "This is a serious problem." Despite those efforts, Philips did nothing to re-certify the MP2 for airworthiness.

72. Failing in its efforts to convince Philips to re-certify the MP2, Janz convinced the Air Force to retest the MP2 for airworthiness at no cost to Philips, which typically would have

been responsible for the $90,000.00 - $100,000.00 cost of testing. The MP2 unit passed certification on or about September 26, 2018.

73. Shortly after the MP2's re-certification on September 26, 2018, however, Philips again replaced the motherboard on the MP2 monitor (and other product components), once again invalidating the product's airworthiness certification.

74. Upon learning of the re-modeled MP2, Janz immediately confronted Philips. Rather than providing Janz with such an explanation, however, Philips notified Janz in October 2018 that Philips would no longer sell MP2s to Janz for resale to any customers, including the Government. Philips further notified Janz that it would not be renewing the Distribution Agreement for 2019 or 2020, effectively cutting ties with Janz. Relators believe that Philips's termination of Janz as a distributor was a direct consequence of its principals having complained to Philips about the lack of airworthiness of MP2s sold to Government customers.

75. From November 5, 2015, through the present, Philips and through its distributor, Janz, sold more than 80 MP2s to the Government, some or all of which did not have the required airworthiness certifications. *See* Appendix A. The underlying invoices and purchase orders for the purchases listed on Appendix A are annexed hereto and incorporated herein by reference as Appendix B.

76. On information and belief, both Philips and its distributors other than Janz also sold MP2s to the Government during that same timeframe that did not have proper airworthiness certifications. Relators estimate that, in total, Philips made or caused to be made, the submission of approximately 3,000 to 3,500 false claims related to sales of uncertified MP2s from November 2015 through September 26, 2018.

77.     Relators thus estimate that, from November 14, 2015, through the present, Philips made or caused to be made, the submission of approximately 3,080 to 3,580 false claims for payment of uncertified MP2s. *See* Appendices A and B.

*     *     *     *

78.     Overall, Relators estimate that, from intermittent periods from sometime after 2012 to the present, Philips made or caused to be made from 4,120 to 5,120 false claims related to sales to the Government of uncertified MP2s. Based on an average cost of $5,900 per military MP2 bundle sold by Janz, Relators allege that treble damages suffered by the Government are at least $2,124,000. Including estimated sales by Philips and/or its distributors at the same average bundle price, such damages could be as much as $72,924,000-$90,624,000.

## VI.     CLAIMS FOR RELIEF

### CLAIM I
### Violations of the Federal False Claims Act
### U.S.C. § 3729(a) – False Claims Regarding Airworthiness Certification

79.     Relators repeat and reallege the allegations set forth in Paragraphs 1 through 78 as if set forth fully herein.

80.     As detailed above, Defendant knowingly or recklessly presented, or caused to be presented, numerous false or fraudulent claims to the United States for payment in violation of the FCA, 31 U.S.C. § 3729(a)(1).

81.     Specifically, on multiple occasions from 2014 to the present, Defendant knowingly or recklessly submitted and/or caused to be submitted various claims to be paid for MP2s that Defendant falsely certified as having received a certification of airworthiness when, in fact, the products were not so certified due to the replacement of a key component that had not be certified as airworthy.

82.    Such statements are false and Defendant acted knowingly, with deliberate ignorance, or with reckless disregard that its actions would cause the Government to sustain damages for payment for the falsely certified MP2.

83.    Defendant's false statements were material to the decision of Government actors to pay such false or fraudulent claims.

84.    As a result of the false statements, the Government has spent millions of dollars for the falsely certified MP2 product.

## VII.    PRAYERS FOR RELIEF

WHEREFORE, Relators, on behalf of itself and the United States, demand and pray that this Court:

A.  Enter judgment against Defendant, holding it liable for three times the amount of damages sustained by the Government because of the acts of Defendant;

B.  Enter judgment against Defendant holding it liable for the maximum civil penalty for each violation of the FCA committed by Defendant;

C.  Enter judgment against Defendant awarding the Relators a percentage of the proceeds recovered by the Government as a result of this action in accordance with 31 U.S.C. § 3730(d);

D.  Enter judgment against Defendant awarding Relators costs and reasonable attorneys' fees for prosecuting this action in accordance with 31 U.S.C. § 3730(d); and

E.  Enter judgment against Defendant awarding any and all other relief that the Court finds to be just and equitable.

## VIII.  JURY DEMAND

Relators demand a jury trial on all claims alleged herein.

Dated: September 6, 2019                    Respectfully submitted,

/s/ Bryan A. Wood
Bryan A. Wood (BBO# 648414)
Stephen Ryan, Jr. (BBO# 669727)
**BERMAN TABACCO**
One Liberty Square
Boston, MA  02109
Tel.:  617-542-8300
Fax:  617-542-1194
bwood@bermantabacco.com
sryan@bermantabacco.com

George W. Price (BBO# 645174)
Julie R. Bryan (BBO# 666950)
**CASNER & EDWARDS, LLP**
303 Congress Street
Boston, MA  02210
Tel: 617-426-5900
Fax: 617-426-8810
price@casneredwards.com
bryan@casneredwards.com